**AFFIRMED; Opinion Filed August 19, 2016.**



In The

# Court of Appeals
# Fifth District of Texas at Dallas

## No. 05-15-00818-CR

### CHRISTOPHER JAMES HOLDER, Appellant
### V.
### THE STATE OF TEXAS, Appellee

**On Appeal from the 416th Judicial District Court**
**Collin County, Texas**
**Trial Court Cause No. 416-80782-2013**

## OPINION

Before Justices Myers, Stoddart, and Whitehill
Opinion by Justice Myers

A jury convicted appellant Christopher James Holder of capital murder and the trial court imposed a mandatory sentence of life imprisonment without the possibility of parole.[1] *See* TEX. PENAL CODE ANN. § 12.31(a)(2). In thirteen issues, appellant challenges the sufficiency of the evidence; the trial court's denial of appellant's motion to suppress his cell phone records; the alleged denial of the right to confrontation; the admission of expert opinion; the trial court's overruling of appellant's objection that the State asked a witness a question that assumed facts not in evidence; the trial court's denial of appellant's motion to suppress his statement to the police; the denial of an article 38.14 accomplice witness instruction; and cumulative error. We affirm.

---

[1] The State did not seek the death penalty.

BACKGROUND

On the evening of Sunday, November 11, 2012, the Plano Police Department responded to a call about a possible burglary at 3121 Royal Oaks Drive, Plano, Texas, where they found fifty-year-old Billy Tanner deceased in his home. He had sustained blunt force trauma to the head and multiple stab wounds.

In the summer of 2012, Billy Tanner's step-daughter, Casey James, her two children, and appellant, Casey's then-boyfriend, moved into Tanner's home. Casey had known Tanner since she was six years old and, although Tanner and Casey's mother were no longer married, Casey and Tanner remained close. She regarded him as a father figure.

By October of 2012, Casey had grown frustrated with appellant and wanted him to leave the house. Hoping to avoid a confrontation, Casey asked Tanner to tell appellant to move out. He moved out of Tanner's house sometime around mid-October of 2012. The morning after he moved out, while Tanner was away at work, appellant and his friend, Thomas Uselton, came back to get the rest of appellant's belongings. According to Casey, they did not knock. They "came barreling through the [back] sliding glass door," which, as Casey recalled, "[s]cared the crap out of me and my daughter."

The week before the murder, Casey's five-year-old daughter, C.J., told her that she wanted to move out of Tanner's house because he was "nasty" and slept without underwear. Casey was concerned, but she had never seen signs that Tanner had treated her children inappropriately. Casey called appellant for advice because he had been around C.J. and Tanner at times when she had not, and she wanted to know if Tanner had done anything that could have offended C.J. or made her feel uncomfortable. Appellant responded, "110 percent." As for why appellant had not brought this to Casey's attention, he said that every time it happened Casey had been in the room, which suggested to Casey that "it wasn't something that I thought was

offensive or that was cause for [C.J.] to be offended." In an abundance of caution, Casey asked her best friend, Cindi Law, to talk to C.J. because the two of them were "super close." The next day, Law picked up C.J. from school and, after talking to the child, determined that C.J. was upset because of the cigarette smoke in the house caused by Tanner's smoking. Law reported to Casey that she believed nothing had happened. After talking to Law, Casey felt relieved. Confident no abuse had occurred, she immediately called appellant to give him the news. According to Casey's testimony, this call occurred on Thursday, November 8, 2012.

Other evidence showed that a Child Protective Services investigator, Trista Herman, interviewed C.J. in December of 2012 and determined that C.J. had not suffered any sexual abuse.

Casey was supposed to be out of town during the weekend of Friday, November 9th, visiting a former boyfriend in prison in Plainview, Texas. She had told appellant, Tanner, and her mother she was going to a family reunion. Law agreed to keep her children for the weekend. When Casey left Tanner's home at around 9:00 or 9:30 p.m. on Friday, Tanner was there alone. This was the last time anyone saw Tanner alive.

At Law's house, Casey slept until about 2:30 or 3:00 a.m. and then left to pick up Victoria Jasso, an acquaintance she had offered to give a ride to the prison, which was about seven hours away. Casey visited her ex-boyfriend on Saturday and Sunday. She and Jasso stayed at a hotel on Saturday night and drove back home on Sunday. Casey dropped off Jasso, picked up her children, and arrived back in Plano at close to 8:00 p.m. When she pulled up in the driveway, Casey noticed the garage door would not raise. She was also surprised her step-father's truck was not there, which was unusual for a Sunday night. Casey went in through the rear sliding glass door. The house was pitch black except for a stream of light from the garage. She took a few steps inside and noticed this "horrible smell" and could see a liquid running down

–3–

the hallway. Casey said that as soon as she stepped into the house she had "the most . . . ill feeling I could ever feel in my life." She went back to her car and called her mother, telling her something was wrong and that she was scared to go into the house. Her mother told her to hang up and call the police, which she did.

Officers Brad Flanagan and Jeff Crane of the Plano Police Department were the first officers to enter the house, arriving there at shortly after 8:00 p.m. They entered through the rear sliding glass door and noticed a strong odor of gasoline and oil, and then discovered a dead body on the floor just inside the doorway to the master bedroom. Officer Flanagan recalled that the body, which appeared to have "been there a while," had sustained a gash to the head, and blood was coming from the forehead. Flanagan testified that there was a lot of blood on the victim. A large burned spot at the entry to the master bedroom and a burned pile of clothes indicated someone had tried to start a fire. Inside the master bedroom, Officer Crane recalled, "[t]here was an enormous amount of blood." There was a large amount of blood on the bed, the bedsheets, and streaks of blood on the walls.

The medical examiner, Dr. William Rohr, testified that Tanner was beaten and stabbed to death. He had sustained blunt force injury to the head and had twenty stab wounds to his neck and upper body. The stab wound to the neck appeared to have been inflicted post-mortem. The stab wounds to Tanner's hands appeared to be defensive-type injuries.

Among the items collected at the crime scene was a pair of black latex gloves found on the kitchen table. There was no blood on the gloves, and Casey said the gloves were not there when she left on Friday. Also found on the dining room table was a glass with a clear liquid in it, a bottle of ammonia, and a water bottle with construction paper around it. Tanner's red pickup truck, which he used for work, was missing from the residence, as was his cell phone and laptop computer. A steak knife was found stuck in the wall above the sink affixed to a blanket

–4–

that it held in place, and a hammer was found in the living room. No blood evidence was found on the hammer; the steak knife does not appear to have been analyzed.

The condition of the crime scene led Detective Elizabeth Spillman, the lead detective on the case, and Detective Joel Scott Epperson, who assisted her, to believe, based on training and experience, that this had been a crime of passion rather than a burglary "gone bad." Detective Epperson testified that the blunt trauma to Tanner's body was so massive that, at first, it was not clear whether he had been shot, beaten to death, or stabbed. The large amount of blood was unusual because a burglar's main goal is usually to obtain property and avoid confrontation. It also appeared the suspect had spent some time at the residence, which is unusual because the typical burglar is a stranger who does not know the habits of residents that could return home at any time. It was also odd that rifles were still hanging on the wall in the master bedroom, since such items would likely have been taken in a typical burglary.

Because Casey lived at Tanner's residence she was initially considered a suspect. But after interviewing various witnesses—Casey, her mother Teresa Heppel, Victoria Jasso, Cindi Law—and speaking with officials at the Plainview state prison Casey and Jasso visited that weekend, detectives verified Casey's alibi and determined she could not have committed the murder.

Appellant soon became a person of interest to detectives. Appellant and Steve James, Teresa Heppel's older brother, were, according to Casey's testimony, "extremely close." Heppel testified that she had been at her brother's house on Saturday afternoon, where she saw appellant. Cell phone records showed that Billy Tanner's phone called Steve James's phone on Saturday, November 10, 2012, at 1:41 p.m., and that the call lasted 3.92 minutes. James confirmed that he spoke with Tanner that day and that Heppel was there, although he was not sure when the call took place. According to James, the call was quick and Tanner mentioned that James "should

come see him more often." Heppel remembered James speaking to someone on the phone during her Saturday visit, and that James had told her it was Tanner he had been speaking with. Cell phone records also showed that Tanner's cell phone called the phone number of his parents in Louisiana on Saturday, November 10, 2012, at 1:46 p.m. The call lasted 49.7 minutes, ending at 2:35 p.m. This was the last call from Tanner's phone to register with a cell tower that day or the next, when Tanner's body was found. Tanner received some calls during that time that went straight to voicemail, indicating the phone was either out of service or did not have power.

Teresa Heppel, Casey James's mother and Tanner's ex-wife, testified during the State's case-in-chief that on Saturday, November 10th, she visited her brother at his Irving home—probably between 2:00 and 4:00 p.m. Appellant was there when she arrived, and James "right off" asked her to go to the store for him. Appellant was gone when she returned. When defense counsel questioned Heppel,[2] she testified that while she was at her brother's house that Saturday afternoon, he got a telephone call from Tanner and that, when James hung up, he told her, "That's weird, that was Bill calling, he never calls me." Heppel acknowledged telling Detective Spillman that she thought the phone call may have been "staged" for her benefit. Heppel also admitted telling the detective that James had a propensity for violence towards suspected child molesters. Under the State's questioning, Heppel acknowledged that she had not looked at the cell phone records showing Tanner's phone calling James. She testified that she was "absolutely sure" appellant had committed the offense.

Detectives were particularly interested in the black latex gloves found on the kitchen table in Tanner's house. Detective Spillman learned that appellant was a tattoo artist, and she found a Facebook photo of appellant tattooing while wearing a pair of black latex gloves similar

---

[2] The defense reserved Heppel after she testified during the State's case-in-chief. When she was recalled by the defense during its case-in-chief, Heppel was in the hospital and testified via a live video feed. This is the basis for appellant's eighth issue.

to the ones found in the house. The gloves from the house were submitted for DNA testing, and DNA analysis determined appellant could not be excluded as a major contributor of the mixed DNA swabs collected from the gloves. Christina Capt, the forensic DNA analyst, concluded it would be extremely unlikely anyone other than appellant would be the major contributor of the DNA from the glove swabs.

Regarding Tanner's missing property, investigators obtained a court order to have Tanner's cell phone pinged to locate it. The sim card from Tanner's cell phone was found in Dallas in the possession of Herman Reyna Rivera. When Rivera was interviewed by the police, he claimed he had purchased the cell phone from someone in the parking lot of an auto tire store. Investigators eventually concluded Rivera had lied to them about how he acquired the phone, but they did not believe he had anything to do with Billy Tanner's murder because nothing linked Rivera to the crime scene apart from the phone.[3] Tanner's truck was located in a parking garage of an apartment complex at 383 West Fork Drive, in Las Colinas, Irving. The vehicle was locked, the keys were not in the ignition, and there were no security cameras in the parking garage where the vehicle was found. Tanner's laptop was never recovered.

In January of 2013, law enforcement officers in Tarrant County informed Detective Spillman that Thomas Uselton, an inmate at the Tarrant County Jail, might have information about this case. At the time, Uselton was being held on charges of burglary of a motor vehicle. Detectives Epperson and Spillman interviewed Uselton at the jail. Uselton lied to them at first, but eventually provided very specific and key details regarding the crime scene and the victim that had not been made public. Uselton led the detectives to the Irving parking garage where Tanner's red truck had been found. He also led them to the top of that garage, where he claimed a knife and some other items had been placed in a small shed. Nothing relevant to the case was

---

[3] Rivera did not testify at trial.

found there. Uselton then took the detectives to the Images-N-Ink tattoo shop in Irving where appellant worked, and directed them to a dumpster in the back of the business, where he said he discarded some things. The detective did not find anything relevant to the case in the dumpster. Uselton directed the police to a location where he claimed Tanner's laptop had been discarded. An investigator went to that location but did not find the laptop. Uselton was also able to direct the detectives to Tanner's Plano home. Detective Epperson recalled Uselton was visibly upset and nervous being on the street.

When he testified before the jury, Uselton was in custody in Tarrant County for theft (with two priors) and unauthorized use of a motor vehicle—a state jail felony. He told the jury he had known appellant for a couple of years and that they were best friends. Uselton testified that he had called appellant at around 2:00 or 3:00 p.m. on Saturday, November 10, 2012, because he wanted drugs. Appellant sounded "real hysterical, like real hyper," when Uselton spoke to him. Appellant promised to call him back. Later that day, as it was getting dark outside, appellant called him back and asked if he wanted to help him with something. Uselton said, "Okay, I'll help you with it," and appellant picked him up at a Kroger grocery store located near Camp Bowie in west Fort Worth. When appellant met Uselton at the agreed location, his new girlfriend, Vanessa Garcia, and her son were with appellant in the car, a white Mustang. Appellant was wearing a black sweater. Uselton got in the car and asked, "What are we doing?" Appellant said, "I'll show you when we get there." Appellant and Uselton smoked "dope" as they drove to the Images-N-Ink tattoo shop in Irving, where they went inside to appellant's booth and got some gloves and bleach. Uselton again asked, "What are we doing?" Appellant replied, "I'll tell you when we get there."

They got back in the car and drove to Plano. When they reached some railroad tracks, appellant told Uselton to "text this phone number" and "[t]ell him I'm almost to the house" and

that "[i[f he wants to look at the bike, come on."  At that point, Uselton thought they "were stealing a bike or something."  Uselton texted the message as instructed.  He noticed that appellant was putting on gloves, so Uselton did the same.  They drove to a residential area Uselton did not recognize.  When they reached a cul-de-sac, appellant and Uselton got out of the car, and Garcia drove away.  They approached a house Uselton soon recognized because he had been there before.  Appellant went in the first, followed by Uselton.  Appellant told Uselton to shut and lock the door.  Appellant walked toward the master bedroom, came back, hugged Uselton, and said, "He's dead.  We ain't got to worry about it."  Uselton asked, "Who is dead?"  He walked around the corner and saw Tanner's body.  Blood was all over the walls.  Appellant said, "Look, think about your family, bro.  You know what it is if you say anything."  Uselton asked, "What did he do?"  Appellant replied, "He molested a little girl."  Uselton said, "Well, the piece of shit deserved it then," and they walked into the garage and started smoking "dope."  Uselton said that Tanner's daughter could come home at any minute, and that they should at least "lock the garage door or something."  Appellant unplugged the garage door opener.

Appellant asked Uselton to help him cover up the windows.  They nailed a blanket over the kitchen window and took another blanket and threw it over the rear sliding glass door.  Appellant told Uselton to go and shut the bedroom window, and as he walked past Tanner's body Uselton recalled that it frightened him:  Tanner's eyes were swollen shut and there was a gash on his forehead.  He was pale white and "stiff looking."

Appellant grabbed a sleeping bag and placed it by the door to the bedroom.  Appellant swung at Tanner's body with the sleeping bag before putting it down, and then jumped back as though "he didn't know what he did."  As they were in the garage smoking a cigarette, appellant assured Uselton that "we'll get rid of all this" and "take all this with us."  Appellant went back in the house and came out with a pitcher of tea.  He asked Uselton if he wanted anything to drink.

Uselton said no. When they went back in the house, appellant said there was a "deep freezer" on the back porch and that they could put the body in the freezer. But he had second thoughts when he remembered the back porch light was on and that a police officer lived behind Tanner's house.

Appellant suggested they make it look like a robbery. He mopped the kitchen floor and they poured ammonia in the garage and around where they had been standing. Uselton retrieved the laptop and some other items, and appellant grabbed Tanner's wallet from a dresser drawer. Appellant said, "Let me cut his head off, make sure he's dead," and Uselton replied, "No, dude, I think he's dead, bro. Leave it alone." They walked over to the body. Appellant was holding a butcher knife. Appellant looked at Uselton, looked back at the body, and then leaned over and stabbed the body in the neck with the knife. When appellant pulled out the knife, there was no blood on it.

Appellant had asked Uselton to help him move the body, and Uselton suggested they just "burn the house or something." Appellant got a can of gasoline from the garage and told Uselton to "pour it everywhere." Uselton poured the gas "everywhere." Appellant "lit the fire" and they "barely made it out the door." Uselton turned around after he closed the door behind him; he could see the flames. As they drove away in Tanner's pickup truck, Uselton tossed the laptop out the window. After calling Vanessa Garcia and telling her to pick them up in Las Colinas, appellant parked the truck in a parking garage. Uselton wiped everything in the truck down with bleach, and they disposed of the butcher knife in a shed on the top floor of the garage. As Vanessa drove them to the tattoo shop, Uselton said that he needed to get rid of his "shoes and shit" because he did not want to get caught, and appellant replied, "I know, I know."

When they got to the tattoo shop, Uselton went into the restroom, and when he came out he found appellant standing in the dark crying. Uselton asked appellant if he was okay, and

appellant said, "Yeah, I'll be okay." Appellant gave Uselton some money and went over to talk to Garcia, telling Uselton to go to a nearby convenience store and purchase cigarettes. When Uselton returned from the convenience store, he could hear appellant and Garcia talking in the next room. He testified as follows:

> I went, got a pack of a Marlboro reds and a Dr. Pepper, come back in the tattoo shop, and him and Vanessa are talking about something in another room, and I'm sitting there. I'm sitting in this chair smoking, and I hear through the wall she's like, "Why did you do it?" He's like, "I had to." And then we went to leave and she like didn't want to leave because she went back in another booth where he was, and I went outside. I had a trash bag. I was waiting for him because there was a door. I was looking to go out. He was like, "You want to fucking leave." He goes in there and I hear a smack, smack, hitting noise, "I want to fucking leave now." She comes out crying, and, well, we go to—go downstairs.

They put "everything" in a trash bag, including gloves, clothes, and Tanner's wallet, and Uselton later threw the trash bag in a dumpster at a Fiesta supermarket. It was around 4:00 a.m. when Garcia dropped off Uselton at a friend's house in the North Richland Hills area.

The State's evidence included appellant's cell phone records, which showed the cell phone towers that appellant's phone connected with or was "hitting off" of at various times on Saturday, November 10 and Sunday, November 11, 2012. Two witnesses provided the State's evidence about appellant's cell phone records: K.D. Burdette, an AT&T engineer and custodian of records, and Detective Brian Pfahning, who interpreted and analyzed appellant's cell site data. In addition to the cell phone records that were admitted, the State showed the jury a Power Point presentation of appellant's cell phone data that consisted of a series of server maps depicting the locations of cell towers that appellant's cell phone was "hitting off" of at various times on November 10 and 11, 2012, in relation to areas of interest to the investigation—e.g., the tattoo shop, Vanessa Garcia's home, the crime scene. The State's evidence showed the following:

- From 3:28 to 4:16 p.m. on November 10, 2012, appellant's phone was "hitting off" of a cell tower near Tanner's home at 3121 Royal Oaks, Plano.

- Between 4:16 and 5:05 p.m., appellant's phone traveled from the area of 3121

–11–

Royal Oaks to Irving.

• Between 5:05 and 6:23 p.m., appellant's phone was "hitting off" of cell towers around the area of Vanessa Garcia's home at 2518 W. Newton and the Images-N-Ink tattoo shop at 1221 W. Airport Freeway.

• Between 6:23 and 7:01 p.m., appellant's phone traveled from the area of the Garcia house to the area of Steve James's house at 412 High School Road.

• Between 7:01 and 8:43 p.m., appellant's phone was "hitting off" of a cell tower near Steven James's house.

• Between 8:47 and 8:53 p.m., appellant's phone was "hitting off" of a cell tower near the Images-N-Ink tattoo shop.

• Between 9:15 and 9:42 p.m., appellant's phone was "hitting off" of a cell tower near Vanessa Garcia's house.

• From 10:25 to 11:01 p.m., appellant's phone traveled from Irving to Fort Worth.

• At 11:01 p.m., appellant's phone was "hitting off" of a cell tower near a Kroger grocery store at 9114 Camp Bowie Boulevard in Fort Worth.

• From 11:01 to 11:49 p.m., appellant's phone traveled from Fort Worth to Irving.

• Between 12:41 and 12:44 a.m. on November 11, 2012, appellant's phone was "hitting off" of a cell tower near the crime scene at 3121 Royal Oaks.

• Between 12:44 a.m. and 2:00 a.m., appellant's cell phone had no activity.

• From 2:11 to 2:19 a.m., appellant's phone was "hitting off" of a cell tower in the area of the Las Colinas parking garage at 383 W. Fork, in Irving, where Tanner's truck was found.

• From 2:19 to 2:58 a.m., appellant's cell phone had no activity.

• At 2:58 a.m., appellant's cell phone was "hitting off" of a cell tower near Vanessa Garcia's house.

• From 2:58 until 5:15 a.m., appellant's cell phone had no activity.

• Between 5:15 to 5:24 a.m., appellant's phone was "hitting off" of a cell tower in the North Richland Hills area.

Appellant's cell phone records actually showed that his phone connected eight times between 3:28 and 4:16 p.m. on Saturday, November 10, 2012, with the cell tower that "best served" Tanner's address. Before the jury, Burdette testified that, using AT&T software tools,

–12–

he could confirm whether a particular address fell within the coverage area of a particular tower. He testified that, in determining what the best server is for a particular address, he uses a software "propagation tool" called Atoll. He explained that he uses the AT&T software to plug in information and would get a "propagation map," and that the maps show multiple things, such as the best server for a particular address. He identified the server maps in State's exhibit 51 as the best server maps he "pulled" for this case, and they were admitted. The State displayed the maps for the jury. Burdette testified that, looking at the maps, he determined that the crime scene address, 3121 Royal Oaks, was approximately 3300 feet, or a little over half a mile, from the cell tower that best served that address. He also testified that the range of the relevant tower section or "sector" was, at its farthest point, approximately one mile.

Detectives Brian Pfahning and Elizabeth Spillman interviewed appellant on November 13, 2012, the day after Tanner's body was discovered. The detectives confirmed appellant's cell phone number, which matched the number on the records from AT&T, and he told the detectives that he had his phone with him during the weekend of November 10, 2012. Appellant gave the detectives a timeline of where he had been on November 10th, telling them he went to the Irving tattoo shop, took his girlfriend Vanessa Garcia to work in Irving, went to a birthday party, and then picked Vanessa up from work and went back to her house, where he stayed with her. The next day he went to the movies. The detectives told appellant they had his cell phone records and that his timeline was inconsistent with what the records showed. Appellant did not provide an immediate explanation, but he eventually told them that he had been in the Plano area near Jupiter and Highway 190 trying to buy drugs from a person named "Chris." However, that area is several miles from the crime scene, the two areas are served by different cell phone towers, and the cell phone records show appellant's cell phone was "hitting off" of the cell phone tower nearest Tanner's house on Saturday, November 10th. Appellant denied being at Tanner's house

–13–

on November 10th, and he said the last time he had been there was when Tanner asked him to move out. Appellant also said he never drove Tanner's truck.

The detectives knew from interviewing witnesses that Tanner was, as Detective Spillman recalled, "pretty much a heavy drinker." On weekends, he tended to drink beer in the mornings and pass out sometime in the afternoon. Appellant acknowledged being aware of Tanner's drinking habits.

Appellant claimed he and Tanner had a good relationship. Appellant did not mention any child sexual abuse concerns regarding Tanner, but when asked about it, appellant said he knew about C.J.'s allegations and had talked to Steve James about them. Detective Spillman testified that appellant felt very strongly "children shouldn't be molested." Appellant said he had not been to James's house for a week or so, which was inconsistent with Teresa Heppel's and Steve James's accounts.

Vanessa Garcia testified that she had known appellant since high school and that they dated on and off over the years. While Casey and appellant were dating, Garcia and appellant continued their friendship, which was sometimes sexual. Garcia testified that appellant was staying at the tattoo shop as of Monday, November 5th, the week before the murder, because he did not have a place to live, nor did appellant have a working automobile. She said that she and appellant smoked methamphetamine together and that he was using methamphetamine extensively during that week. She noted that she saw him high on methamphetamine "a lot."[4]

On Saturday, November 10th, appellant drove Garcia to her job in Lewisville in her car and picked her up that evening. She said appellant would typically return at around lunchtime and drop off something for her to eat, but she was not sure if he had done so on that occasion.

---

[4] The medical examiner, Dr. Rohr, testified that methamphetamine stimulates the central nervous system, can affect a person's judgment, and can have numerous psychic effects. It can also cause a person's reaction times to be quicker, and it can contribute to paranoid thinking and sleep deprivation.

After appellant picked Garcia up from work, she dropped him off at a friend's house, where he took a shower, and she picked up her then-six or seven-year-old son. She returned, picked up appellant, and the three of them drove to the tattoo shop in Irving, where appellant went inside for about fifteen minutes. When he came out, he said he needed to go to Fort Worth. Garcia did not ask why.

Appellant drove them to Fort Worth, where they stopped at a grocery store and picked up Thomas Uselton. They eventually arrived in a residential neighborhood in Plano, and appellant and Uselton got out of the car and started walking away. Appellant told Garcia to go home and that he would call her later. She drove home and put her son to bed. At some point during the ensuing early morning hours, appellant called her and told her to pick him up near the parking garage in Las Colinas near Northwest Highway. Vanessa picked up appellant and Uselton as they were walking near the garage and drove them to the tattoo shop. Once inside, Uselton and appellant took off their sweaters and Uselton collected all the trash in the shop and went outside to a dumpster. Garcia did not hear Uselton and appellant talking about anything that had occurred. They left together and dropped off Uselton at a friend's house in Fort Worth.

Garcia and appellant later started getting telephone calls from Plano detectives. When Garcia first talked to Detective Spillman, she said that she had been with appellant that Saturday, but did not mention picking up Uselton. Garcia then met with Spillman at the police station some time during January or February of 2013, and—now represented by counsel—she made another statement that went into more detail and acknowledged picking up Uselton.

The jury ultimately convicted appellant of capital murder as charged in the indictment, and the trial court imposed a mandatory sentence of life imprisonment without the possibility of parole. *See* TEX. PENAL CODE ANN. § 12.31(a)(2). Appellant filed a motion for a new trial, which was overruled by operation of law. This appeal followed.

DISCUSSION

## Issue One: Sufficiency of the Evidence

In his first issue, appellant argues the evidence is insufficient to prove he caused the death of Billy Tanner and that the trial court erred by denying his motion for an instructed verdict.[5] In reviewing the sufficiency of the evidence, we consider all the evidence in the light most favorable to the jury's verdict and determine whether any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt. *Jackson v. Virginia*, 443 U.S. 307, 319 (1979); *Brooks v. State*, 323 S.W.3d 893, 895 (Tex. Crim. App. 2010). The trier of fact is the sole judge of the weight and credibility given to witness testimony. *Cain v. State*, 958 S.W.2d 404, 407 (Tex. Crim. App. 1997). We may not act as the "thirteenth juror" and reweigh the jury's determinations of the weight or credibility of the evidence. *Williams v. State*, 235 S.W.3d 742, 750 (Tex. Crim. App. 2007).

The standard is the same for both direct and circumstantial evidence. *Wise v. State*, 364 S.W.3d 900, 903 (Tex. Crim. App. 2012). The State need not disprove all reasonable hypotheses that are inconsistent with the defendant's guilt. *Id.* Rather, a court considers only whether the inferences necessary to establish guilt are reasonable based upon the cumulative force of all the evidence when considered in the light most favorable to the verdict. *Id.*; *see also Hooper v. State*, 214 S.W.3d 9, 12 (Tex. Crim. App. 2007).

The indictment alleged that on or about November 10, 2012, in Collin County, Texas, appellant did:

> then and there intentionally cause the death of an individual, namely, Billy Tanner, by striking Billy Tanner in the head with an unknown object and stabbing Billy Tanner with a knife or unknown object, and the defendant was then and

---

[5] A challenge on appeal to the denial of a motion for a directed verdict is a challenge to the legal sufficiency of the evidence. *Todd v. State*, 242 S.W.3d 126, 136 (Tex. App.—Texarkana 2007, pet. ref'd); *Rice v. State*, 195 S.W.3d 876, 879 (Tex. App.—Dallas 2006, pet. ref'd); *Yarborough v. State*, 178 S.W.3d 895, 903 (Tex. App.—Texarkana 2005, pet. ref'd).

there in the course of committing or attempting to commit the offense of burglary of a habitation of Billy Tanner, who was the owner of said habitation[.]

A person commits the offense of capital murder if he intentionally commits a murder in the course of committing or attempting to commit the offense of burglary. *See* TEX. PENAL CODE ANN. § 19.03(a)(2). A person commits burglary if, without the effective consent of the owner, the person enters a building or habitation and commits or attempts to commit a felony, theft, or an assault. *Id*. § 30.02(a)(3). A person commits theft if he unlawfully appropriates property with the intent to deprive the owner of that property. *See id*. § 31.03(a).

Appellant contends the evidence he killed Billy Tanner is insufficient, noting that Tanner was already dead when appellant and Thomas Uselton burglarized the home and cleaned up the crime scene, and that no forensic evidence connects appellant with the murder. No witnesses place him at the scene of the homicide when Tanner could have been alive, nor is there testimony regarding how long Tanner had been dead when appellant and Uselton went into the house. Appellant adds that no testimony was offered of a possible time frame for Tanner's death. Moreover, while appellant's cell phone records show his phone was used in Plano on Saturday, November 10, 2012, they do not prove he killed Tanner, nor do those records prove he was the person using the phone.

The factfinder is responsible for resolving conflicts in the testimony, weighing the evidence, and drawing reasonable inferences from basic facts. *Murray v. State*, 457 S.W.3d 446, 448 (Tex. Crim. App. 2015). On appeal, we "determine whether the necessary inferences are reasonable based upon the combined and cumulative force of all the evidence when viewed in the light most favorable to the verdict." *Clayton v. State*, 235 S.W.3d 772, 778 (Tex. Crim. App. 2007). "Thus, '[a]ppellate courts are not permitted to use a 'divide and conquer' strategy for evaluating sufficiency of the evidence' because that approach does not consider the cumulative force of all the evidence." *Murray*, 457 S.W.3d at 448 (quoting *Hacker v. State*, 389 S.W.3d

–17–

860, 873 (Tex. Crim. App. 2013)). When, as here, the record supports conflicting inferences, we presume the factfinder resolved the conflicts in favor of the verdict, and we defer to that determination. *See id.*; *Hooper*, 214 S.W.3d at 12.

The jury could have reasonably inferred Tanner was killed sometime on Saturday, November 10, 2012, between 2:35 p.m. and midnight. The State presented evidence that Tanner talked to Steve James on the phone at 1:41 p.m. on November 10th. Only minutes later, at 1:46 p.m., Tanner's phone called his parents' number and stayed connected until 2:35 p.m. This was the last call from Tanner's phone to register with a cell tower until after the body was discovered. Uselton's testimony indicates Tanner was dead by late Saturday night or early Sunday morning, when he and appellant entered Tanner's home. The time frame is supported by appellant's cell phone records, which show his phone was "hitting off" of a tower near Tanner's home at between 12:41 and 12:44 a.m. on the morning of Sunday, November 11.

Additionally, appellant had motive and opportunity to kill Tanner. Although motive and opportunity are not elements of capital murder and do not prove identity, they are circumstances indicative of guilt. *Merritt v. State*, 368 S.W.3d 516, 526 (Tex. Crim. App. 2012). Appellant had been asked by Tanner to move out his home after appellant's relationship with Casey James deteriorated. The evidence also showed appellant was aware, before the murder, of what C.J. had said about Tanner. Appellant expressed strong feelings to Detective Spillman that children should not be molested. According to Uselton's testimony, appellant told him Tanner had molested a little girl. Uselton also overheard Garcia asking appellant at the tattoo shop on Sunday morning "Why did you do it?", to which appellant replied, "I had to." The evidence further showed appellant was familiar with the Tanner house and Tanner's habits, including the fact that he drank heavily and was often intoxicated on weekends. AT&T's cell phone records and server maps showed appellant's cell phone connected multiple times to the AT&T cell tower

closest to Tanner's home between 3:28 and 4:16 p.m. on Saturday afternoon. Uselton testified that when he spoke to appellant at around 3:00 p.m. on Saturday, appellant sounded hysterical and "hyper" and said he needed Uselton's help. In addition, the record shows appellant made inconsistent and improbable statements to the police.

The jury could have likewise considered that appellant directed Uselton to the scene of a recent murder, acted relieved at finding the victim dead, knew why he had been killed, and then went to great lengths to conceal evidence and clean up the crime scene. *See Guevara v. State*, 152 S.W.3d 45, 50 (Tex. Crim. App. 2004) ("Attempts to conceal incriminating evidence, inconsistent statements, and implausible explanations to the police are probative of wrongful conduct and are also circumstances of guilt."). Further, when appellant and Uselton were looking at Tanner's body, appellant warned Uselton to think about his family and that he should not "say anything," *See Wilson v. State*, 7 S.W.3d 136, 141 (Tex. Crim. App. 1999) (threats against a witness evidences a consciousness of guilt). And later, during the cleanup of the crime scene, appellant stabbed Tanner in the neck even after Uselton assured him he was already dead, suggesting appellant had a personal animus towards the victim.

Based on the cumulative force of the evidence presented, taken as a whole and viewed in the light most favorable to the verdict, we conclude a rational trier of fact could have found that appellant committed the offense of capital murder as charged in the indictment. Accordingly, the evidence is sufficient to support the conviction. We overrule appellant's first issue.

**Issues Two, Three, and Ten: Motion to Suppress Cell Phone Records**

In his second, third, and tenth issues, appellant contends the trial court erred by denying his motion to suppress his cell phone records because those records were obtained in violation of federal law, Texas law, and the Texas Constitution.

Appellant filed two pretrial motions to suppress his cell phone records: One motion to

suppress argued the State's petition used to obtain the records failed to comply with federal and state law; the other argued the cell phone records were obtained in violation of the U.S. and Texas Constitutions. At the suppression hearing, Detective Jeff Rich testified that he submitted a petition, pursuant to article 18.21, section 5, of the Texas Code of Criminal Procedure, to a state district court, asking for a court order directing AT&T Wireless to provide account history and call detail records, including tower information, for calls made or received on the cell phone number belonging to appellant between October 20 and November 12, 2012.

Detective Rich presented the petition to the district court, which signed the order. After Rich presented the court order to AT&T, a company representative requested that the petition's language be changed from "Petitioner has specific and articulable facts" to "Petitioner has probable cause." The detective made the requested change, and the district court signed a revised court order, after which AT&T tendered the requested records. The State's petition reads as follows:

> Now comes Petitioner, the City of Plano, Texas, acting by and through the undersigned peace officer of the Plano Police Department, Plano, Collin County, Texas. Pursuant to the authority of article 18.21, Section 5, Texas Code of Criminal Procedure, Petitioner hereby makes written application for a Court Order to obtain the below-listed records or information pertaining to a subscriber or customer of the below-listed electronic communication service.
>
> The following records or information are sought:
> *Any and all records regarding the identification of a **AT&T Wireless** user with the assigned telephone number of: **469-286-7425**, to include subscriber's name, address, date of birth, status of account, account history, call detail records, **including tower information** for calls made or received, for the period of October 20, 2012 through November 12, 2012, service address and billing address, ANI, method of payment and information on any and all other numbers assigned to this account or this user in the past or present. Affiant also requests that this order allow for the precision location/GPS location of the cellular handset to be provided for a period of 20 days beginning November 12, 2012.*
>
> The name of the company believed to be in possession of this information is:
> **AT& T Wireless**
> **POB 24679**

**West Palm Beach, Florida 33416**
**(888) 938-4715**

Petitioner has probable cause that the above records or information are relevant to a current, on-going police investigation of the following offense or incident:

**Death Investigation – Texas PC 19.03**

The cellular telephone was used by a possible suspect to communicate with unknown persons and obtaining the locations of the handset will allow investigators to identify if this suspect was in the area at the time of the offense and will provide investigators leads in this case.

The trial court ultimately denied the motions to suppress the cell phone records in a written order.

We review a trial court's ruling on a motion to suppress for an abuse of discretion. *State v. Story*, 445 S.W.3d 729, 732 (Tex. Crim. App. 2014) (citing *State v. Dixon*, 206 S.W.3d 587, 590 (Tex. Crim. App. 2006)). We view the record "in the light most favorable to the trial court's determination, and the judgment will be reversed only if it is arbitrary, unreasonable, or 'outside the zone of reasonable disagreement.'" *Id.* (quoting *Dixon*, 206 S.W.3d at 590). "We will sustain the lower court's ruling if it is reasonably supported by the record and is correct on any theory of law applicable to the case." *Dixon*, 206 S.W.3d at 590. We apply a bifurcated standard of review, giving almost total deference to a trial court's determination of historic facts and mixed questions of law and fact that rely upon the credibility of a witness, but applying a de novo standard of review to pure questions of law and mixed questions that do not depend on credibility determinations. *Martinez v. State*, 348 S.W.3d 919, 922–23 (Tex. Crim. App. 2011) (citing *Guzman v. State*, 955 S.W.2d 85, 87–89 (Tex. Crim. App. 1997)). Because there were no credibility determinations in this instance, we apply a de novo standard of review.

Federal law provides that a governmental entity may require a provider of electronic communication service or remote computing service to disclose a record or other information pertaining to a customer of such service only when the governmental entity obtains a warrant or

–21–

"obtains a court order for such disclosure under subsection (d) of this section."  18 U.S.C. §

2703(c)(1)(A) & (B).  The statute further provides:

> A court order for disclosure under subsection (b) or (c) may be issued by any court that is a court of competent jurisdiction and shall issue only if the governmental entity offers specific and articulable facts showing that there are reasonable grounds to believe that the contents of a wire or electronic communication, or the records or other information sought, are relevant and material to an ongoing criminal investigation.

*Id*. § 2703(d).  Appellant argues the court order that was used to obtain his cell phone records

violated federal law because the State's petition did not set out the statutorily required "specific

and articulable facts."

The petition, as revised, stated that the petitioner had probable cause to believe that the

requested phone records or information was relevant to a current, on-going police investigation

of a capital murder.  The petition further stated the cell number at issue was "used by a possible

suspect" and that "obtaining the locations of the handset [would] allow investigators to identify if

this suspect was in the area at the time of the offense and will provide investigators with leads in

this case."  Although the petition did not set out an offense date, when Detective Rich executed

the petition, the morning after Tanner's body was found, the police did not yet have a time frame

for when the offense occurred.  Moreover, the petition's request for historical cell data was

limited to twenty days, suggesting the offense was committed within that time span.

In *Anderson v. State*, No. 05–11–00259–CR, 2013 WL 1819979, at *10 (Tex. App.—

Dallas Apr. 30, 2013, no pet.) (not designated for publication), we overruled a claim similar to

appellant's, concluding that court orders for cell phone records satisfied section 2703 where the

petition stated that "petitioner had reason to believe that the records and information sought were

relevant in a current, on-going police investigation of a capital murder that occurred on January

10, 2009, and was reported on Dallas Police Department offense number 9747-W."

Appellant recognizes *Anderson* but contends the Texas Court of Criminal Appeals'

–22–

decision in *Ford v. State*, 477 S.W.3d 321 (Tex. Crim. App. 2015), raises the question of what constitutes the minimum amount of "specific and articulable facts" under the federal statute.[6] Appellant refers to a footnote in *Ford* where the court stated that, while the information contained in the State's application was not before it, the application contained "three pages of exhaustive detail to establish the 'reasonable belief that the information sought is relevant to a legitimate law enforcement inquiry' that is necessary for an order under TEX. CODE CRIM. PROC. art. 18.21, Sec. 5(a), as well as the 'specific and articulable facts' showing required" under the federal statute. *Id.* at 325 n.4. As the court acknowledged in that footnote, however, the question of whether the information contained in the State's application satisfied the federal statute was not before it. *See id.* Therefore, the case is distinguishable and offers no guidance regarding how the federal statute should be applied in a situation such as this. We conclude the State's revised petition set forth "specific and articulable facts" and that it sufficiently established reasonable grounds to believe the requested cell records were "relevant and material to an ongoing criminal investigation." *See* 18 U.S.C. § 2703(d).

Appellant also argues the State's petition violated article 18.21, section 5, of the code of criminal procedure, which provides that "[a] court shall issue an order authorizing disclosure of contents, records, or other information of a wire or electronic communication held in electronic storage if the court determines that there is reasonable belief that the information sought is relevant to a legitimate law enforcement inquiry." TEX. CODE CRIM. PROC. ANN. art. 18.21, § 5(a). Appellant, however, does not specify how the State's petition is insufficient under the Texas statute, arguing the federal and state statutes have "similar intent" and that he

---

[6] In *Ford*, the court held that the State's warrantless acquisition of four days' worth of historical cell site information under article 18.21, section 5(a), did not violate the Fourth Amendment because appellant had no "legitimate expectation of privacy in records held by a third-party cell-phone company identifying which cell-phone towers communicated with his cell phone at particular points in the past." *Id.* at 330. The court concluded that "[t]he State did not violate Ford's Fourth Amendment rights when it obtained that information by way of a court order under Article 18.21 section 5(a) of the Texas Code of Criminal Procedure—an order available on a showing short of probable cause." *Id.*

"incorporates all arguments and authorities from issue two." Having already concluded the State's petition is sufficient under 18 U.S.C. section 2703(d), we likewise conclude the petition is sufficient under section 5 of article 18.21.

Appellant further argues that the State's acquisition of his cell phone records without a warrant violated his rights under article I, section 9 of the Texas Constitution because he had a reasonable expectation of privacy that information related to his use of phone numbers would not be disclosed. In support of his argument, appellant cites *Richardson v. State*, a case in which the court of criminal appeals, addressing whether a warrant should be required to obtain a pen register, held that "the use of a pen register *may well* constitute a 'search' under Article I, § 9 of the Texas Constitution." 865 S.W.2d 944, 953 (Tex. Crim. App. 1993) (emphasis added).

We have noted that the Texas Constitution does not provide any greater protection than the Fourth Amendment in situations such as this, where the State is attempting to acquire an appellant's cell phone records from a third party. *See Doyal v. State*, Nos. 05–14–00943–CR, 05–14–00944–CR, 2016 WL 447528, at *3 (Tex. App.—Dallas Feb. 4, 2016, no pet.) (mem. op., not designated for publication) ("There is nothing in the Texas Constitution nor the cases interpreting article I, section 9 that would give Doyal a privacy interest in TMobile's business records such that he could successfully challenge the warrant the police used to obtain those records."); *Hankston v. State*, No. 14–13–00923–CR, 2015 WL 3751551, at *5–6 (Tex. App.— Houston [14th Dist.] June 16, 2015, pet. granted) (mem. op., not designated for publication) (using Fourth Amendment precedent to conclude that the State's acquisition of appellant's cell phone records did not violate article I, section 9 of the Texas Constitution). Furthermore, contrary to appellant's suggestion, *Richardson* does not hold that article 18.21, section 5, violates the Texas Constitution. As the court stated, it did not address the "question remaining," which was "whether such a search would be 'unreasonable' in the absence of probable cause," and, if

–24–

so, whether article 18.21 violates article I, section 9, "to the extent it authorizes a court ordered pen register without a showing of probable cause." *Richardson*, 865 S.W.2d at 953–54. The court of criminal appeals remanded the case for the court of appeals to decide the question of "reasonableness, *inter alia*." *Id.* On remand, the court of appeals resolved the case on a different basis, holding that Richardson did not have standing to complain about an actual expectation of privacy because he disclosed the fact that he was calling the telephone numbers in question to other third parties. *Richardson v. State*, 902 S.W.2d 689, 693–94 (Tex. App.—Amarillo 1995, no pet.). Therefore, as we stated in *Doyal*, we disagree with appellant that *Richardson* requires us to conclude he has a privacy interest in the cell phone records that we must protect. *See Doyal*, 2016 WL 447528, at *3. We overrule appellant's second, third, and tenth issues.

**Issue Four: The Right to Confrontation**

In his fourth issue, appellant argues the trial court erred by overruling appellant's objection to a witness presenting her testimony via a cell phone, thereby violating appellant's Sixth Amendment right to confrontation.

Heppel, as we have already noted, testified during the State's case-in-chief. When the State passed her for cross-examination, appellant reserved the witness. The trial court told Heppel, "Please make sure the investigator has your number in case you need to be recalled, but you may step down at this point." Earlier that day, the court had stated that until witnesses were released by the court, they remained available and were still under subpoena. Nine days later, when defense counsel was presenting his case-in-chief, he advised the court that he had tried to contact Heppel and learned she was in the hospital. Counsel informed the court that he had received a fax from the Medical Center of Plano dated May 28, 2015, that reads as follows: "To Whom It May Concern, Teresa Heppel has been hospitalized at the Medical Center of Plano since May 25th, 2015, to the present date. Ms. Heppel's date of discharge is unknown at this

time.  If you have any questions, please feel free to contact me."  The note was signed by "Shelby Rawls," followed by a telephone number.  Defense counsel also told the court that an infectious disease specialist was requiring Heppel to stay one more day.

The next day, Friday, May 29, 2015, Heppel remained hospitalized and unable to appear.  The trial court informed the jury that "[w]e're still in that phase of trying to figure out exactly how to use technology, hopefully, to work around this issue and resolve it to be able to get you the evidence, so both sides can rest and close today."  After the jury was excused, counsel for the State told the court that they were having trouble establishing a video connection with Heppel.  The trial court summarized the situation:

> All right.  So just so the record reflects our most current information, we're still— Ms. Heppel is still in the hospital.  We are attempting to make a connection with her that allows for video conferencing and realtime conversation that the jury can observe and the witness and the attorney can observe.  We haven't been able to accomplish that yet.  We're trying to accomplish that now, and still waiting to see if we're done.  Since we have that extra avenue we're looking at, I guess I'll stand down a little bit and see if that works.  But I'm starting to lose what glimmer of hope I had of finishing today, and I'm pretty close to telling the jury to go home and come back Monday morning, if that doesn't work.  And worst case scenario, again, over the weekend, figure out the issue on this.

Following a brief recess, the trial court connected with Heppel's husband in her hospital room via a cell phone.  After introducing itself, the court told Heppel's husband that "I know you probably can't see me" and "[y]ou probably see the ceiling in our courtroom."  The court then verified that he was there with his wife, and asked to speak to Heppel.  Heppel's husband handed the phone to her, and the trial court asked if she was in a place where she would be able to testify by video conference.  Heppel replied, "Sure."  The court also asked if she understood she was still under oath, to which she replied, "Yes."

Appellant objected based on the Sixth Amendment right to confront witnesses, the Fourteenth Amendment right to due process, and the Article I due course of law provision in the Texas Constitution.  Appellant also moved that the trial be continued until Monday, arguing "the

–26–

witness is in the hospital, she's laying in the hospital bed, she's indicated that she's on some medication that has made her somewhat groggy, and that she may not have her full capacities about her." The trial court overruled the objection. Later that day, when the defense questioned Heppel in the jury's presence, she testified that she was in the hospital "on a video feed."

The Sixth Amendment of the United States Constitution as applied to the states through the Fourteenth Amendment provides, in pertinent part, "[i]n all criminal prosecutions, the accused shall enjoy the right . . . to be confronted with the witnesses against him." U.S. CONST. amend. VI. This clause, known as the Confrontation Clause, "guarantees the defendant a face-to-face meeting with witnesses appearing before the trier of fact." *Coy v. Iowa*, 487 U.S. 1012, 1016 (1988). But the right to a physical face-to-face meeting is not absolute and must "give way" in certain narrow circumstances where "considerations of public policy and necessities of the case" so dictate. *Maryland v. Craig*, 497 U.S. 836, 848 (1990).

Texas courts have allowed witnesses to testify electronically when, for example, the witness was in an at-risk pregnancy, seriously ill, a child, or on active military duty in another country. *See Gonzales v. State*, 818 S.W.2d 756, 764 (Tex. Crim. App. 1991) (court did not deny appellant his constitutional rights by allowing child witness to testify by two-way closed-circuit system); *Paul v. State*, 419 S.W.3d 446, 459 (Tex. App.—Tyler 2012, pet. ref'd) ("Jordan's serious health situation was an exceptional circumstance that warranted permitting her testimony by a computer video conferencing system."); *Rivera v. State*, 381 S.W.3d 710, 713 (Tex. App.—Beaumont 2012, pet. ref'd) ("We conclude that under the circumstances, the preference for having witnesses testify in the courtroom must give way to the practical considerations involving Taylor's military obligation that made his physical presence impractical."); *Stevens v. State*, 234 S.W.3d 748, 782 (Tex. App.—Fort Worth 2007, no pet.) ("Ward's tenuous health situation— documented by letters from his treating cardiologist—was an exceptional circumstance that

warranted permitting his testimony by two-way closed circuit television."); *Ordonez-Orosco v. State*, No. 05–15–00699–CR, 2016 WL 1223467, at *3 (Tex. App.—Dallas Mar. 22, 2016, no pet.) (mem. op., not designated for publication) (thirteen-year-old child victim of continuous sexual abuse was "extremely emotional and traumatized by seeing appellant, to the point of hyperventilating and passing out," and "closed-circuit television procedure preserved salutary effects of face-to-face confrontation"; child victim testified under oath, was subject to cross-examination, and jury was able to observe demeanor); *Montague v. State*, No. 03–14–00266–CR, 2016 WL 112378, *4–5 (Tex. App.—Austin Jan. 6, 2016, pet. ref'd) (mem. op., not designated for publication) (allowing electronic testimony from out-of-state witness who was pregnant and had been advised by doctor she could go into pre-term labor if she traveled more than 70 miles satisfied Sixth Amendment concerns; at-risk pregnancy was exceptional circumstance justifying remote testimony); *Acevedo v. State*, No. 05–08–00839–CR, 2009 WL 3353625, at *8 (Tex. App.—Dallas Oct. 20, 2009, pet. ref'd) (not designated for publication) (allowing a pregnant witness with a risk of miscarriage to testify by means of a two-way conferencing system did not violate defendant's Sixth Amendment rights)

The crucial inquiry in these cases was whether the method of electronic testimony used by the State preserved the "salutary effects of face-to-face confrontation" relevant to a Sixth Amendment analysis. *See Stevens*, 234 S.W.3d at 782. These salutary effects include "(1) the giving of testimony under oath, (2) the opportunity for cross-examination, (3) the ability of the fact-finder to observe demeanor evidence, and (4) the reduced risk that a witness will wrongfully implicate an innocent defendant when testifying in his presence." *Id*. (citing *Craig*, 497 U.S. at 845–46); *see Gonzales*, 818 S.W.2d at 764 (applying "*Craig* criteria" and concluding witness "testified under oath, was subject to extensive cross-examination, and was observed by the judge, the jury and appellant").

–28–

Heppel's testimony preserved these effects. To begin with, she had previously appeared in person in the courtroom during the State's case-in-chief and testified before the jury. Appellant was afforded an opportunity to cross-examine her, and both the jury and appellant had an opportunity to observe and assess her demeanor. Appellant elected to wait and recall Heppel during his case-in-chief. While appellant was free to do so, his confrontation right was satisfied when he had the opportunity, but declined, to cross-examine Heppel. *See Silva v. State*, 622 S.W.2d 902, 903–04 (Tex. App.—Fort Worth 1981, no pet.) ("The passing of Smith without further cross-examination, although reserving the right to recall him, was a deliberate exercise of defense strategy. Deliberate trial tactics do not ordinarily exact constitutional protection."); *see also Phillips v. Wyrick*, 558 F.2d 489, 496 (8th Cir. 1977) ("Once the opportunity to cross-examine has been accorded, the confrontation requirement is fulfilled. The actual use then made of the opportunity becomes a matter of defense strategy, and deliberate trial tactics do not ordinarily exact constitutional protection.") (citation omitted); *Nino v. State*, No. 05–14–00787–CR, 2016 WL 912285, at *2 (Tex. App.—Dallas Mar. 10, 2016, no pet.) (mem. op., not designated for publication) ("[W]e cannot conclude the trial court abused its discretion by refusing further questioning when defense counsel had the opportunity but did not utilize it."). Furthermore, when appellant recalled Heppel, she testified under oath and was cross-examined. The record shows that Heppel's face appeared on a large video screen in the courtroom and that the jury and appellant could see her face in the courtroom during her testimony.

Appellant raises additional concerns, such as that Heppel did not testify about why she was in the hospital, when she was likely to be released, who was in the hospital room with her, or whether she could see the defendant. None of these complaints, however, were raised in the trial court. *See* TEX. R. APP. P. 33.1(a); *Porath v. State*, 148 S.W.3d 402, 414 (Tex. App.—Houston [14th Dist.] 2004, no pet.) (parties should not be encouraged to "lay behind the log," waiting to

–29–

assert error on appeal that should have been addressed in trial court). Appellant also argues the trial court failed to make specific findings supporting its decision, but nothing in *Maryland v. Craig* requires a court to make explicit, as opposed to implicit, findings about the necessity of a special procedure. *Lively v. State*, 968 S.W.2d 363, 367 (Tex. Crim. App. 1998). Based on the record before us, we cannot say the trial court abused its discretion. We overrule appellant's fourth issue.

### Issues Five, Six, and Seven: Expert Opinion

Appellant's fifth, sixth, and seventh issues concern the admissibility of expert opinion. In his fifth issue, appellant argues the trial court erred by admitting, over his objections, an expert opinion that on the afternoon of November 10, 2012, appellant's cell phone "was most likely within one mile of Tanner's address." TEX. R. EVID. 702. In his sixth issue, appellant contends the trial court erred by denying appellant's request that an expert produce the underlying facts and data to support his opinion. TEX. R. EVID. 705. In his seventh issue, appellant argues the trial court erred by overruling his rule 403 objection to an expert's opinion and his cell tower coverage maps. TEX. R. EVID. 403.

The rule 702 hearing concerned the testimony of K.D. Burdette, a senior radio engineer with AT&T Mobility. Burdette, who has bachelor of science degrees in both electrical and computer engineering and has been a "radio frequency" engineer for eleven years, testified as the custodian of records for AT&T's historical cell site data reports for appellant's cell phone number. He also testified about cell phone tower location and coverage. Burdette testified that he is familiar with how cell phones communicate with one another and the scientific principles behind that communication. His job responsibilities included reducing dropped calls and improving network quality throughout north Texas. Burdette testified that, by looking at records, he could determine the tower that a cell phone was hitting or "pinging" off of at a particular time,

the location of that tower, and that, if given an address, he could determine the tower that would most likely service that address.

Asked by defense counsel if he had brought any reports concerning this case, Burdette testified that he authenticated maps and records the State provided him. He explained that he was not allowed to create his own reports or maps to produce at trial because of proprietary concerns. When asked if he had done any empirical studies regarding any of the opinions he was going to provide in this case, Burdette replied, "Yes, sir. I was able—with our planning tools, I was able to do propagation analysis to determine what the most likely server would be in some of these addresses given to me." Burdette testified that he did not "do the math" regarding his opinions about cell towers and cell tower sections in this case; he instead used a computer model that was developed by two other individuals he identified as "Lee and Hata." Burdette did not know the underlying data they used to develop the mathematical models that the propagation computer analysis was based on.

Burdette testified that he had conducted some research to determine an approximate range of the signal for the tower's sector that serviced 3121 Royal Oaks, the crime scene. He testified that the best server plot showed "the coverage range of that particular sector at just slightly less than a mile." Some of the things Burdette had researched were AT&T's proprietary information, so AT&T would not allow him to bring them to court unless ordered to do so. Defense counsel argued Burdette's testimony was inadmissible without the underlying data on which his opinion was based. The trial court ultimately held that, before Burdette could render an opinion about a radius or geographic limitation to the cell phone tower's service, he must provide the propagation maps—the tools that showed the distances the radio frequencies would travel in a particular area based on several factors—on which his opinion was based.

Later in the trial, the State informed the trial court and defense counsel that Burdette had

the underlying data and documents and that he would produce them if the court ordered him to do so, which it did. During a hearing held out of the jury's presence, Burdette stated that he had previously testified as an expert in interpreting and analyzing cell site data and cell records. He explained that, based on addresses the State provided him, and with the appropriate tools from AT&T, he could determine the most likely tower to service a particular address—the "best server" for a particular address. Burdette put those maps into a Power Point presentation. He also testified that "I can say, based on those maps, that the—I can say what the most likely server for that address would have been, based on those maps." After redactions, the maps were later introduced in a Power Point presentation as State's exhibit 57.

The State asked Burdette if he could use the maps to determine the approximate range of the coverage for each sector. He indicated he could, answering that the legend keys on the maps should indicate a tower's approximate range. Defense counsel asked what studies he had done to find out if his experience is accurate or valid science. Burdette answered:

> We vet the propagation models quite often against dry data, as we spoke of yesterday, to make sure that our calculations are fairly accurate. Our design tools need to be extremely accurate to be able to design a new cell site and have it perform the way we want it to perform.

Burdette also explained that he created the propagation maps using a software tool provided by AT&T called Atoll, and that he was trained to use that software and had used it for several years. In his experience, the software is accurate. Burdette testified that the maps he brought to court were accurate to the best of his knowledge. He stated that he could get the underlying input data that was used to develop the server maps, but he would have to go into AT&T's secure databases again and "bring the cell site—the height, antenna type," and that he would have to "export our clutter" for the entire area of the cell tower and get "very large files" that would be "somewhat meaningless to you in a lot of cases." Burdette agreed that someone with his same experience could input that data and run the same analysis. Defense counsel asked

if the information would be "meaningful to somebody who had the same experience that he had," and Burdette answered, "Yes, sir. They could—they could input that data and run the same analyses."

Defense counsel objected to the use of the propagation maps, contending they were misleading, inaccurate, and that the defense was not provided with the underlying data "for the basis of the depiction of the map." Counsel argued the map itself was not the underlying data; it was the product of some other statistical analysis. He also argued that, without the underlying data, any expert opinion indicating "where the position of a particular handset was on the dates in question" would be inadmissible under rules 702 to 705 of the rules of evidence and should also be excluded under rule 403 because of the danger of confusion of the issues. The State replied that most of the defense's arguments went to the weight of the evidence rather than its admissibility, and that the jurors could draw their own conclusions and make their own inferences. The court overruled the objection, stating:

> The witness will be allowed to testify about the geographic area that the cell towers are most likely to serve.
>
> The question you phrased earlier was different than the question he answered earlier, saying would a certain hit be consistent with a cellphone being at that address. I'm still saying that's beyond the reach. What you can say, at 3121 Royal Oaks the most likely server would be whatever the answer is. I think the issue can be adequately fleshed out about the limitations of this science on cross-examination, and then the jury will determine what weight, if any, to give to the evidence.

We review a trial court's decision to admit or exclude expert testimony for an abuse of discretion. *Sexton v. State*, 93 S.W.3d 96, 99 (Tex. Crim. App. 2002). The admissibility of expert testimony is governed by Texas Rule of Evidence 702, which was designed to relax the traditional barriers to opinion testimony. TEX. R. EVID. 702; *Morris v. State*, 361 S.W.3d 649, 654 (Tex. Crim. App. 2011). Rule 702 provides:

> A witness who is qualified as an expert by knowledge, skill, experience, training,

or education may testify in the form of an opinion or otherwise if the expert's scientific, technical, or other specialized knowledge will help the trier of fact to understand the evidence or to determine a fact in issue.

TEX. R. EVID. 702. It is a trial court's responsibility under rule 702 to determine whether proffered scientific evidence is sufficiently reliable and relevant to assist the jury. *Jackson v. State*, 17 S.W.3d 664, 670 (Tex. Crim. App. 2000). Thus, before admitting expert testimony, the trial court must be satisfied three conditions are met: (1) the witness qualifies as an expert by reason of his knowledge, skill, experience, training, or education; (2) the subject matter of the testimony is appropriate for expert testimony; and (3) admitting the expert testimony will actually assist the fact finder in deciding the case. *Vela v. State*, 209 S.W.3d 128, 131 (Tex. Crim. App. 2006); *Jackson*, 17 S.W.3d at 670. These conditions are commonly referred to as (1) qualification, (2) reliability, and (3) relevance. *Vela*, 209 S.W.3d at 131.

The focus of the reliability analysis is to determine whether the evidence has its basis in sound scientific methodology such that testimony about "junk science" is weeded out. *Tillman v. State*, 354 S.W.3d 425, 435 (Tex. Crim. App. 2011). Reliability centers on principles and methodology rather than the conclusions an expert generates by using those principles or methodology. *See Daubert v. Merrell Dow Pharmaceuticals Inc*., 509 U.S. 579, 572 (1993); *Kelly v. State*, 824 S.W.2d 568, 572 (Tex. Crim. App. 1992). Although an inquiry as to reliability is flexible, the proponent of the evidence must establish some foundation for the reliability of an expert's opinion. *Vela*, 209 S.W.3d at 134. The demonstration of reliability must be made by clear and convincing evidence. *Russeau v. State*, 171 S.W.3d 871, 881 (Tex. Crim. App. 2005).

To be considered sufficiently reliable to be of help to a jury, the proponent of scientific evidence must show that (1) the underlying scientific theory must be valid; (2) the technique applying the theory must be valid; and (3) the technique must have been properly applied on the

occasion in question. *Vela*, 209 S.W.3d at 134; *Kelly*, 824 S.W.2d at 573. The court of criminal appeals has also identified a nonexclusive list of factors that a trial court can consider in determining reliability: (1) the extent to which the underlying scientific theory and technique are accepted as valid by the relevant scientific community, if such a community can be ascertained; (2) the qualifications of the expert testifying; (3) the existence of literature supporting or rejecting the underlying scientific theory and technique; (4) the potential rate of error of the technique; (5) the availability of other experts to test and evaluate the technique; (6) the clarity with which the underlying scientific theory and technique can be explained to the court; and (7) the experience and skill of the person(s) who applied the technique on the occasion in question. *Somers v. State*, 368 S.W.3d 528, 536 (Tex. Crim. App. 2012); *Kelly*, 824 S.W.2d at 573.

In some cases, the first two prongs of the *Kelly* test—the validity of the underlying scientific theory and the validity of the technique applying that theory—can be determined by judicial notice. *See Somers*, 368 S.W.3d at 536.

> Once the validity of a scientific theory or technique has been widely accepted in a sufficient number of trial courts through adversarial gatekeeping hearings, future courts may take judicial notice of the validity of that theory or technique based upon the process, materials and evidence produced at those prior hearings.

*Id.* When evaluating a trial court's gatekeeping decision, appellate courts may take judicial notice of other appellate opinions concerning a specific scientific theory or technique. *Id.* Appellate courts may not, however, become "'independent scientific sleuths to ferret out the appropriate scientific materials,'" and "'judicial notice on appeal cannot serve as the sole source of support for a bare trial court record concerning reliability.'" *Id.* (quoting *Hernandez v. State*, 116 S.W.3d 26, 30–32 (Tex. Crim. App. 2003)). Because the distinction between various types of testimony may often be blurred, the court of criminal appeals "explicitly refrained from developing rigid distinctions between 'hard' science, 'soft' sciences, and nonscientific testimony." *Morris*, 361 S.W.3d at 655.

–35–

Appellant argues the State failed to establish the reliability of Burdette's testimony. Appellant points out that the State failed to provide the trial court with any scientific articles or learned treatises supporting the reliability of the science or Burdette's opinion, and the record does not show that any citations to appellate opinions on the subject were presented to the trial court. It is important to remember, however, that while appellant's fifth issue states Burdette's opinion was that appellant's cell phone "was most likely within one mile of Tanner's address" on the afternoon of November 10, 2012, Burdette's actual testimony was that, looking at the relevant propagation map, he could determine that the side of the cell tower that "best served" the location of the crime scene had a coverage range, at the farthest point, of *approximately one mile*. Burdette is a senior radio engineer with AT&T Mobility. He testified that he has worked as an engineer with AT&T for approximately ten years and that he has previously testified as an expert in interpreting and analyzing cell site data and cell records. He testified that he is trained to use AT&T's Atoll software, that he has used it for several years, and that, based on his experience, the software is accurate. He also testified that the propagation maps are based on AT&T's need to better serve its customers and that the propagation models are vetted "quite often against dry data . . . to make sure that our calculations are fairly accurate." He added that "[o]ur design tools need to be extremely accurate to design a new cell site and have it perform the way we want it to perform."

Additional testimony regarding the scientific theory behind cell phone and cell phone tower communication was not proffered at the rule 702 hearing, but the underlying scientific theory was not the focus of the reliability challenge. The record shows that appellant challenged the reliability of Burdette's opinion, yet it also shows appellant did not explicitly challenge the underlying scientific theory on which Burdette's opinion was based. Indeed, the record indicates that, throughout the majority of the two hearings, both parties and the trial court appeared to

–36–

accept that cell phone companies could determine the approximate coverage ranges of their equipment, given the right data. When, for example, Burdette testified that his opinions are based on propagation maps that are generated by AT&T's Atoll computer program, appellant did not challenge the scientific validity of that program. He also showed Burdette a propagation map from another case as an example of the kind of data an expert would need to rely on in determining the boundaries of any particular cell tower—e.g., "And without doing a propagation map, you really have no way of knowing where the boundaries of any particular cell tower are, correct?" The focus of appellant's questions to Burdette was on the factors he applied in creating the propagation maps and forming his opinion. Based on his questions to Burdette at the hearing, appellant was not attacking the underlying scientific principles or methodology AT&T uses to determine its coverage areas, e.g., the scientific validity of the Atoll program, but rather questioning the conclusions Burdette could draw from that methodology. This, however, is not a proper reason to find the evidence unreliable. In a rule 702 challenge, the focus must be solely on principles and methodology, not the conclusions they generate. *See Daubert*, 509 U.S. at 595; *United States v. Freeman*, No. 06–20185, 2015 WL 2062754, at *4 (E.D. Mich. May 4, 2015). Therefore, to the extent appellant is challenging the reliability of Burdette's opinion that the relevant sector of the cell tower had an approximate one-mile coverage range, we conclude that the reliability of the scientific principles underlying Burdette's testimony has been shown.

As for appellant's argument that the trial court should have granted his request for Burdette to produce the "underlying facts and data to support his opinion," rule 705(b) provides that in a criminal case, a party against whom an expert opinion is offered shall be permitted to conduct a voir dire examination directed to the underlying facts or data upon which the opinion is based, and that such examination shall be conducted outside the presence of the jury. *See* TEX. R. EVID. 705(b). The trial court must allow this examination to be conducted outside the hearing

of the jury and prior to the expert testifying to his opinion before the jury. *Alba v. State*, 905 S.W.2d 581, 587–88 (Tex. Crim. App. 1995). The purpose of rule 705(b) is to give defense counsel the "opportunity to determine the foundation of the expert's opinion without fear of eliciting damaging hearsay or other inadmissible evidence in the jury's presence." *Id.* at 588. The voir dire hearing may also allow the defendant to develop an objection that the expert's testimony lacks a sufficient basis for admissibility. *Id.*; *see* TEX. R. EVID. 705(c) (opinion inadmissible if court determines underlying facts or data do not provide sufficient basis for opinion under rule 702 or 703). Because rule 705(b) is mandatory in a criminal case, the trial court errs if it denies a defendant's timely and proper request for a rule 705(b) hearing. *Alba*, 905 S.W.2d at 588.

The record shows that appellant had ample opportunity to voir dire Burdette about the underlying facts or data supporting his opinion, in accordance with rule 705(b), including Burdette's opinion that the relevant tower's sector had a coverage range of approximately one mile. During the hearings on the reliability of Burdette's opinion, the trial court attempted to get defense counsel to be more specific about the kind of data he wanted. At one point, for example, during the first day of the hearings, the court asked counsel, "Can you be specific about what you believe that data is?" Counsel replied, "[W]ithout having a transcript of all of his testimony there, I don't think I can be specific a lot, but I think in general terms it relates to the underlying data concerning the propagation issue, propagation maps." Later, after Burdette produced the propagation maps, he explained that, to get the underlying data he had entered into the Atoll program to produce the maps, he would have to go into AT&T's secure databases and "bring the cell site—the height, the antenna type," and that he would have to "export our clutter" for the entire area of the cell tower and get "very large files" that would be "somewhat meaningless to you." Appellant, however, did not pursue further questioning after eliciting from Burdette that

he could produce the data. Although he maintained that he wanted the "underlying data," appellant never established—despite ample opportunity to examine Burdette about the facts or data supporting his opinion—the specific nature, character, substance, or content of the underlying data he needed or why he needed it. Additionally, appellant fails to cite any authority in support of the notion that rule 705(b) somehow requires an expert to *produce* the underlying data, nor has our own research found such a case. Based on the record before us, no abuse of discretion has been shown.

Turning to appellant's rule 403 argument, he contends that "Burdette's opinion concerning the phone's location being within one mile of Tanner's house was the sine qua non for Holder being the murderer," and that his inability to cross-examine Burdette with the underlying data for his opinion was unfairly prejudicial. But this assertion, as we have already explained, mischaracterizes Burdette's testimony. Furthermore, the portion of appellant's brief devoted to this issue fails to include any analysis, argument, or citation of relevant authority in support of his contention that the trial court erred in overruling appellant's rule 403 objection. Appellant simply "incorporates all of the arguments and authorities from his issues one—six." Because we are under no obligation to make appellant's arguments for him, we conclude this issue is inadequately briefed and that it presents nothing for our review. *See* TEX. R. APP. P. 38.1(i); *Lucio v. State*, 351 S.W.3d 878, 896–97 (Tex. Crim. App. 2011); *Busby v. State*, 253 S.W.3d 661, 673 (Tex. Crim. App. 2008) (affirming that court has no obligation "to construct and compose" a party's "issues, facts, and arguments 'with appropriate citations to authorities and to the record.'"). We overrule appellant's fifth, sixth, and seventh issues.

### Issue Eight: Improper Question

In his eighth issue, appellant argues the trial court erred by overruling his objection to a prosecutor's question posed to an accomplice witness "which assumed facts not in evidence that

Holder had confessed murder to him." As mentioned earlier, Uselton testified that when he first saw Tanner's body he asked appellant, "What did he do?" Appellant responded, "He molested a little girl." Later in the State's examination of Uselton, the following exchange occurred:

> Q. [State]: And why did you—what—what was the reason [appellant] gave to you for killing this guy?
>
> A. [Uselton]: He molested a little girl.
>
> DEFENSE COUNSEL: Just a second. Just a second. I object to that, assumes facts not in evidence. He never said that [appellant] said, "I killed this guy."
>
> TRIAL COURT: Objection is overruled. Answer if you can.
>
> Q. Go ahead.
>
> A. He said he molested a little girl.

Assuming without deciding that the trial court erred, the State's question did not affect appellant's substantial rights. *See* TEX. R. APP. P. 44.2(b); *Russell v. State*, 155 S.W.3d 176, 181 (Tex. Crim. App. 2005) (error in admitting testimony is non-constitutional error). Appellant points to a jury note stating that they were in disagreement on whether appellant had "admitted murder" to Uselton or just why Tanner was killed, but the jury's note does not show appellant suffered an infringement of his substantial rights. First, there was testimony at trial showing appellant had not explicitly confessed to Uselton. Both parties elicited testimony from Detective Epperson that Uselton never said appellant had admitted to killing Tanner, and Uselton admitted he was not present when Tanner was killed and did not see who had killed him. The record also shows that, in response to the jury's note, the trial court read back a portion of Uselton's testimony, i.e., "I asked him, 'What did he do?' He said, 'He molested a little girl,'" which showed appellant did not explicitly confess to Uselton.[7] The strong circumstantial evidence supporting appellant's guilt also weighs in favor of finding that the error was harmless. *See, e.g.,*

---

[7] We also point out that appellant did not object to the trial court's response to the jury note, so he did not preserve anything for review regarding the trial court's response to the note. *See* TEX. R. APP. P. 33.1(a); *Green v. State*, 912 S.W.2d 189, 192 (Tex. Crim. App. 1995).

*Powell v. State*, 88 S.W.3d 794, 801 (Tex. App.—El Paso 2002, pet. struck) (strong circumstantial evidence connecting the defendant to the crime weighed in support of finding that the erroneous admission of evidence was harmless). We further conclude that the error, if any, was rendered harmless by Uselton's prior testimony that he overheard Garcia asking appellant "why did you do it," to which appellant answered, "I had to." Any error in the admission of evidence is cured when the same evidence is admitted elsewhere at trial without objection. *See Khoshayand v. State*, 179 S.W.3d 779, 784 (Tex. App.—Dallas 2005, no pet.); *Posey v. State*, 840 S.W.2d 34, 37 (Tex. App.—Dallas 1992, pet. ref'd). We overrule appellant's eighth issue.

### Issues Nine and Twelve: Motion to Suppress and Article 38.23 Instruction

In his ninth issue, appellant argues the trial court erred by denying his motion to suppress his statement to the police. In his twelfth issue, appellant contends the trial court erred by denying his request for an instruction to the jury that his statement to the police could not be considered by them if he requested a lawyer prior to being given his *Miranda* warnings.

Prior to trial, appellant filed two motions to suppress his statements to the police, alleging violations of the Fifth and Sixth Amendment right to counsel and articles 38.22 and 38.23 of the code of criminal procedure. At the suppression hearing about appellant's statements to the police, Detective Spillman testified that she learned that appellant was in custody in the Irving City Jail for outstanding warrants. Two days after the offense, Detectives Spillman and Pfahning (who also testified at the suppression hearing) went to the Irving Police Department and interviewed appellant. Appellant was handcuffed during the interview, which was video-recorded and played for the jury.

According to the testimony at the suppression hearing and the recording of the interview, when appellant walked into the interview room he said, "Do I need to have an attorney or something?" Detective Spillman said, "I'm sorry?" Appellant asked, "Do I need to have an

attorney with me right now?" Appellant paused and said, "I kind of feel like it." Detective Pfahning asked, "Do you need an attorney? I mean, we're just going to—what?—well, she's going to advise you, and we'll let you know what—we won't ask you any questions. We'll tell you what we're here for, and then you can decide." Detective Spillman said she was going to read appellant his *Miranda* warnings because he was in jail. When she finished reading the warnings and asked if appellant understood them, he nodded in agreement and said "yes." Detective Spillman said she wanted to talk to appellant about Tanner's death. During the interview that followed, appellant did not invoke his right to counsel. The trial court ultimately denied appellant's motions to suppress his statements.

In reviewing claims concerning the admission of statements made as the result of custodial interrogation, we conduct the bifurcated review articulated in *Guzman v. State*. *See Pecina v. State*, 361 S.W.3d 68, 78–79 (Tex. Crim. App. 2012) (citing *Guzman v. State*, 955 S.W.2d 85, 89 (Tex. Crim. App. 1997)). We afford almost total deference to the trial court's rulings on questions of fact and on questions involving the application of law to fact that turn upon a witness' credibility and demeanor. *Id*. at 79. We review de novo the trial court's rulings on questions involving the application of law to facts that do not turn upon a witness's credibility and demeanor. *Id*. But as the *Pecina* court explained, in deciding whether an accused has "actually invoked his right to counsel," the Supreme Court has dictated that we use an objective standard "to avoid difficulties of proof and to provide guidance to officers conducting interrogations." *Id*. (citing *Davis v. United States*, 512 U.S. 452, 458–59 (1994)).

When an accused asks for a lawyer, questioning must cease until counsel has been provided or the defendant initiates further communication with the police. *Edwards v. Arizona*, 451 U.S. 477, 484–85 (1981). Once a suspect has invoked his right to counsel, no subsequent exchange initiated by the police can serve to undermine the clarity of the invocation. *State v.*

*Gobert*, 275 S.W.3d 888, 894–95 (Tex. Crim. App. 2009). Before a duty to terminate an interrogation arises, the accused's request for counsel must be clear — the police are not required to attempt to clarify ambiguous or equivocal remarks. *Davis*, 512 U.S. at 461–62; *Pecina*, 361 S.W.3d at 79; *Davis v. State*, 313 S.W.3d 317, 339 (Tex. Crim. App. 2010). The accused must unambiguously request counsel during a custodial interrogation. *Pecina*, 361 S.W.3d at 79. To unambiguously request counsel, the suspect "must articulate his desire to have counsel present sufficiently clearly that a reasonable police officer in the circumstances would understand the statement to be a request for an attorney." *Davis*, 512 U.S. at 459; *Davis*, 313 S.W.3d at 339. "A statement either is such an assertion of the right to counsel or it is not." *Davis*, 512 U.S. at 459. If the accused's invocation of the right to counsel is clear, his responses to further questioning may not be used to cast doubt retrospectively on the clarity of his initial request. *Davis*, 313 S.W.3d at 339. We view the totality of circumstances from the viewpoint of the objectively reasonable police officer conducting a custodial interrogation. *Davis*, 512 U.S. at 459; *Pecina*, 361 S.W.3d at 79.

Appellant argues that a reasonable police officer would have understood appellant's statement that he felt like he needed a lawyer to be request for an attorney. But the totality of the circumstances shows appellant was not clearly and unambiguously requesting counsel. Appellant's statements, both by the language used and viewed in the context of the totality of the circumstances, were not a clear and unambiguous assertion of the right to counsel. *See, e.g., Davis*, 512 U.S. at 462 (defendant's statement, "Maybe I should talk to a lawyer," was not request for counsel); *Davis*, 313 S.W.3d at 338–41 (defendant's statement during police interview, "I should have an attorney," did not expressly invoke right to counsel under circumstances presented); *Beham v. State*, 476 S.W.3d 724, 728–31 (Tex. App.—Texarkana 2015, no pet.) ("I was gonna try to see if I could get a lawyer" did not invoke right to counsel);

–43–

*Hartwell v. State*, 476 S.W.3d 523, 529–32 (Tex. App.—Corpus Christi 2015, pet. ref'd) (defendant's question, "should I maybe call my attorney friend and see what he thinks," was not an unequivocal and unambiguous request for counsel); *Williams v. State*, 402 S.W.3d 425, 434 (Tex. App.—Houston [14th Dist.] 2013, pet. ref'd) (defendant's query, "Do I need a lawyer present for this," was equivocal request for counsel).

As in *Davis v. State*, the equivocal nature of appellant's statements is bolstered by the fact that he signaled the interview should continue. *See Davis*, 313 S.W.3d at 341. Detective Pfahning explained to appellant that he could decide what to do after Detective Spillman read him his rights and explained why they were there. After she did so, appellant voluntarily answered questions and did not ask for an attorney. Based on the circumstances presented, we conclude appellant did not clearly and unambiguously invoke his right to counsel and that a reasonable officer, in light of the circumstances, would have understood only that appellant "might be invoking the right to counsel." *See Davis*, 512 U.S. at 459. Therefore, the trial court properly denied appellant's motions to suppress.

Turning to the trial court's refusal to include an article 38.23(a) instruction in the jury charge, when reviewing claims of jury charge error, we first determine whether an error actually exists in the charge. *See Ngo v. State*, 175 S.W.3d 738, 743 (Tex. Crim. App. 2005) (citing *Middleton v. State*, 125 S.W.3d 450, 453 (Tex. Crim. App. 2003)). If error exists and appellant objected to the error at trial, reversal is required if the error "is calculated to injure the rights of [the] defendant," which means there must be "some harm" to appellant from the error. *Reeves v. State*, 420 S.W.3d 812, 816 (Tex. Crim. App. 2013); *Almanza v. State*, 686 S.W.2d 157, 171 (Tex. Crim. App. 1984) (op. on reh'g), *superseded on other grounds by rule as stated in Rodriguez v. State*, 758 S.W.2d 787, 788 (Tex. Crim. App. 1988).

The court of criminal appeals provides the following summary of jury instructions that

relate to the taking of confessions:

> Under Texas statutory law, there are three types of instructions that relate to the taking of confessions: (1) a "general" Article 38.22, § 6 voluntariness instruction; (2) a "general" Article 38.22, § 7 warnings instruction (involving warnings given under § 2 and § 3); and (3) a "specific" Article 38.23(a) exclusionary-rule instruction. In essence, the Section 6 "general" instruction asks the jury: "Do you believe, beyond a reasonable doubt, that the defendant's statement was voluntarily made? If it was not, do not consider the defendant's confession." The Section 7 instruction sets out the requirements of 38.22, § 2 or § 3 and asks the jury to decide whether all of those requirements were met. The Article 38.23(a) "specific" instruction is fact-based: For example, "Do you believe that Officer Obie held a gun to the defendant's head to extract his statement? If so, do not consider the defendant's confession."

*Oursbourn v. State*, 259 S.W.3d 159, 173–74 (Tex. Crim. App. 2008). Article 38.23(a) of the code of criminal procedure reads as follows:

> No evidence obtained by an officer or other person in violation of any provisions of the Constitution or laws of the State of Texas, or of the Constitution or laws of the United States of America, shall be admitted in evidence against the accused on the trial of any criminal case.

> In any case where the legal evidence raises an issue hereunder, the jury shall be instructed that if it believes, or has a reasonable doubt, that the evidence was obtained in violation of the provisions of this Article, then and in such event, the jury shall disregard any such evidence so obtained.

TEX. CODE CRIM. PROC. ANN. art. 38.23(a). The jury charge in this case included instructions asking the jury whether appellant's statement "was freely and voluntarily made . . . without compulsion or persuasion," whether he was advised of his rights, and whether he "knowingly, intelligently, and voluntarily" waived those rights. *See id*. art. 38.22, §§ 6, 7. The charge, though, did not include an article 38.23(a) jury instruction. Appellant argues that a fact-specific instruction—"directing the jury to determine whether he requested a lawyer even prior to being admonished of his right to have a lawyer"—was required under article 38.23(a) and constitutional due process grounds.

However, in *Contreras v. State*, 312 S.W.3d 566 (Tex. Crim. App. 2010), the court of criminal appeals rejected this argument, explaining:

–45–

*Miranda* or article 38.22, not article 38.23, is the vehicle for excluding statements obtained in violation of the *Miranda* guidelines. And because *Miranda* claims do not fall within the ambit of article 38.23, a defendant is not entitled to a jury instruction under that statute. Article 38.22, not article 38.23, is the appropriate vehicle for obtaining a jury instruction regarding a purported violation of *Miranda*, to the extent such a vehicle is available.

*Id.* at 583; *Williams v. State*, No. 09–10–00219–CR, 2011 WL 6229164, at \*7 (Tex. App.—Beaumont Dec. 14, 2011, no pet.) (mem. op., not designated for publication). An article 38.23 instruction is required "if there is a factual dispute as to how the evidence was obtained." *Balentine v. State*, 71 S.W.3d 763, 773 (Tex. Crim. App. 2002). In this case, there is no factual dispute regarding how the police obtained appellant's statement and the voluntariness of that statement was addressed through the article 38.22 instructions the trial court provided to the jury. The court was not required to give the jury an article 38.23(a) instruction.[8] *See Contreras*, 312 S.W.3d at 583. We overrule appellant's ninth and twelfth issues.

### Issue Seven:  Accomplice Witness Instruction

In his seventh issue, appellant contends the trial court erred by denying his request for an article 38.14 accomplice-witness jury instruction regarding Uselton. Appellant asserts that the denial of the instruction was error because Uselton could have been prosecuted for the lesser-included offense of burglary.

We review the trial court's decision to deny a requested accomplice-witness jury instruction for an abuse of discretion. *Delacerda v. State*, 425 S.W.3d 367, 395 (Tex. App.—Houston [1st Dist.] 2011, no pet.); *see also Paredes v. State*, 129 S.W.3d 530, 538 (Tex. Crim. App. 2004). Under article 38.14 of the code of criminal procedure, "[a] conviction cannot be had upon the testimony of an accomplice unless corroborated by other evidence tending to connect the defendant with the offense committed." TEX. CODE CRIM. PROC. ANN. art. 38.14. "To be

---

[8] To the extent appellant claims his request for the instruction was based on constitutional provisions besides article 38.23, he does not set out how the issue would be differently analyzed under these provisions. Thus, he has not preserved error on those issues.

considered an accomplice witness, the witness's participation with the defendant must have involved some affirmative act that promotes the commission of the offense with which the defendant is charged." *Druery v. State*, 225 S.W.3d 491, 498 (Tex. Crim. App. 2007). If the witness cannot be prosecuted for the defendant's charged offense, or a lesser-included offense of that charge, the witness is not an accomplice witness as a matter of law. *Id.* A person is not an accomplice if he knew about the offense and failed to disclose it or helped the accused conceal it. *Smith v. State*, 332 S.W.3d 425, 439 (Tex. Crim. App. 2011). "And complicity with an accused in the commission of another offense apart from the charged offense does not make that witness's testimony that of an accomplice witness." *Druery*, 225 S.W.3d at 498. Finally, when the evidence clearly shows that a witness is not an accomplice, the trial court is not obliged to instruct the jury on the accomplice-witness rule as a matter of law or fact. *Smith*, 332 S.W.3d at 440.

Appellant points to no evidence suggesting Uselton played any part in Tanner's murder. Indeed, as appellant stated in his written objections to the jury charge:

> Under the State's theory, Mr. Uselton's conduct did not encompass acting in connection with a capital murder or murder. The victim was already dead when he entered the house. Hence, he is not an accomplice to the alleged acts of the Defendant in causing the death, or entering the house with the intent to cause the death.

Moreover, any burglary prosecution against Uselton based on entering Tanner's home *after* Tanner's death and committing theft is a separate and distinct offense from the charged capital murder offense. As appellant acknowledged in his written objections to the charge, "The entry into the home of the victim by Holder and Uselton, and the acts of theft, arson, tampering with evidence, abuse of a corpse, and unauthorized use of a motor vehicle were part of a separate and distinct criminal episode or transaction, completely unassociated with the homicide." Thus, Uselton was not an accomplice as a matter of law. *See Druery*, 225 S.W.3d at 500 ("[M]erely

–47–

assisting after the fact in the disposal of a body does not transform a witness into an accomplice witness in a prosecution for murder."); *Paredes*, 129 S.W.3d at 537 ("Although [a witness] assisted after the fact in the disposal of the bodies, he is not an accomplice as a matter of law because he is not susceptible to prosecution for capital murder."). The trial court did not abuse its discretion by denying the requested instruction. We overrule appellant's seventh issue.

### Issue Thirteen: Cumulative Error

In his thirteenth and final issue, appellant argues the cumulative effect of the errors in his trial abridged his right to due process. Having already concluded, in resolving appellant's first twelve issues, that there was no reversible error by the trial court, it follows that there was no cumulative error. *See Chamberlain v. State*, 998 S.W.2d 230, 238 (Tex. Crim. App. 1999) ("[W]e are aware of no authority holding that non-errors may in their cumulative effect cause error."); *see also Rayford v. State*, 125 S.W.3d 521, 534 (Tex. Crim. App. 2003) ("non-errors may not in cumulative effect cause error"); *Underwood v. State*, No. 05–06–01589–CR, 2008 WL 3117077, at *11 (Tex. App.—Dallas Aug. 7, 2008, no pet.) (not designated for publication) (rejecting appellant's contention that the cumulative effect of the errors warranted reversal because the Court "found either no error or no harm in resolving [appellant's] issues against her"). Accordingly, we overrule appellant's thirteenth issue.

We affirm the trial court's judgment.

/Lana Myers/
LANA MYERS
JUSTICE

Do Not Publish
TEX. R. APP. 47
150818F.U05



## Court of Appeals
## Fifth District of Texas at Dallas

# JUDGMENT

CHRISTOPHER JAMES HOLDER,
Appellant

No. 05-15-00818-CR     V.

THE STATE OF TEXAS, Appellee

On Appeal from the 416th Judicial District
Court, Collin County, Texas
Trial Court Cause No. 416-80782-2013.
Opinion delivered by Justice Myers. Justices
Stoddart and Whitehill participating.

Based on the Court's opinion of this date, the judgment of the trial court is **AFFIRMED**.

Judgment entered this 19th day of August, 2016.